**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHANNA DWYER, Derivatively on Behalf of Nominal Defendant FMC CORPORATION, | Case No. |
| Plaintiff, | **DEMAND FOR JURY TRIAL** |
| v. | |
| MARK A. DOUGLAS, ANDREW D. SANDIFER, PIERRE R. BRONDEAU, EDUARDO E. CORDEIRO, CAROL ANTHONY DAVIDSON, KATHY L. FORTMANN, K'LYNNE JOHNSON, PATRICIA VERDUIN, C. SCOTT GREER, MARGARETH ØVRUM, ROBERT C. PALLASH, PAUL J. NORRIS, and VINCENT R. VOLPE, JR., | |
| Defendants, | |
| and | |
| FMC CORPORATION, | |
| Nominal Defendant. | |

**<u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>**

Plaintiff Johanna Dwyer ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant FMC Corporation ("FMC" or the "Company"), against certain of its Board of Directors (the "Board") and executive officers seeking to remedy breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of federal securities laws occurring from at least February 9, 2022 through October 30, 2023 (the "Relevant Period"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis

by Plaintiff's counsel, including a review of publicly available information, such as filings by FMC with the U.S. Securities and Exchange Commission (the "SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, including a consolidated federal securities class action against the Company and certain of the Individual Defendants (defined below) captioned *In Re FMC Corporation Securities Litigation,* Case No. 2:23-cv-04398-KNS (E.D. Pa.) (the "Securities Class Action"), and other matters of public record.

## I.        NATURE AND SUMMARY OF THE ACTION

1.        FMC is a Philadelphia, Pennsylvania-based agricultural sciences company incorporated in Delaware.  The Company develops, manufactures, and distributes a variety of crop protection products throughout the world.  These products include herbicides, insecticides, and fungicides.

2.        The Company's operations are broken out into four primary regions: North America, Latin America ("LATAM"), Asia-Pacific ("APAC"), and Europe, the Middle East, and Africa ("EMEA").  FMC primarily sells its products through authorized distributors, who then sell the products on to retailers and ultimately to farming operations within each of its operational regions.

3.        In 2017, FMC acquired two diamide insecticide products from Dupont de Nemours, Inc. ("Dupont") for a total of $1.2 billion.  These products, Rynaxypyr and Cyazypyr (together, the "Diamide Products") are industry-leading pesticides, the acquisition of which, FMC called "transformative" with the potential to generate billions in revenue.

4.        Throughout the Relevant Period, the Individual Defendants continuously touted the Company's purportedly sustained, industry-leading growth, driven by increasing demand for the Company's products, including the Diamide Products, healthy inventories in distribution channels, and robust patent protections for FMC's leading products.

5.     Yet, unbeknownst to investors, the truth was far more stark.  Due in large part to COVID-19 supply chain disruptions and uncertainties, many of FMC's distributors and retailers had accumulated significant amounts of excess inventory during the height of the pandemic.  When these disruptions began to subside in 2022 and 2023, FMC experienced a significant drop in demand as customers worked through their oversupply of products, or in some cases, attempted to return products they had already purchased.  In an effort to stimulate demand, FMC began offering steep discounts on its products.  This ultimately had the effect of materially reducing the Company's revenue.  In addition, FMC was also facing dwindling demand for its products, including its flagship Diamide Products, due to the introduction of low-cost generic alternatives into key markets across the world and changing competition landscapes due to industry consolidation.

6.     While these developments were a material risk to the Company's ability to produce sustainable revenue growth, the Individual Defendants concealed these issues from the investing public until they could no longer do so.  The truth gradually emerged through a series of corrective disclosures and revelations.  The first of these disclosures occurred on May 1, 2023, when FMC disclosed that it was reducing its guidance for its second fiscal quarter of 2023 due largely to "channel inventory management in India" and "Diamides partners adjusting inventory levels."

7.     On July 10, 2023, the Company issued another partial corrective disclosure when it again reduced its second quarter 2023 guidance and reduced its full-year 2023 guidance.  According to the Company, these reductions were the result of "unforeseen and unprecedented volume declines in three out of four operating regions, as our channel partners rapidly reduced inventory levels."

8.      These revelations led to FMC's stock declining from $93.04 per share on Friday, July 7, 2023 to $82.67 per share on Monday, July 10, 2023.  Representing a decline of approximately 11%.

9.      Then, on September 7, 2023, Blue Orca Capital issued a report revealing that FMC had suffered a series of litigation losses in China and India related to the enforceability of the Company's patents for its Diamide Products.  The report further described the influx of generic diamide products into India, China, and Brazil, a direct threat to FMC's business in those countries.

10.     On this news, FMC's stock price fell from $73.35 per share on September 6, 2023 to $67.91 per share on September 7, 2023.  Representing a decline of approximately 7.4%.

11.     Further revelations were made on October 23, 2023, when FMC disclosed additional information about its inventory issues, including that "destocking conditions [were] not expected to improve in the near-term."  On this date the Company also further reduced its third quarter, fourth quarter, and full-year 2023 revenue and Adjusted Earnings Before Interest Taxes Depreciation and Amortization ("EBITDA") guidance.

12.     On this news, FMC's stock price dropped from $60.28 per share on October 20, 2023 to $50.52 per share on October 24, 2023.  Representing a decline of approximately 16.2%.

13.     Finally, on October 30, 2023, FMC disclosed that it was suffering from significant cash flow constraints due to "higher inventory and lower payables" and further revealed reductions in revenue figures across all of the Company's regions.  The Company attributed these disappointing results to "[l]ower volumes in all regions caused by destocking from channel customers and partners."

14.     On this news, FMC's stock price fell from $52.18 per share on October 30, 2023, to $47.90 per share on October 31, 2023.  Representing a decline of approximately 8.2%.

15.    As a result of the foregoing, FMC has suffered, is suffering, and will continue to suffer significant financial and reputational harm.  Additionally, Plaintiffs have not made a pre-suit demand on the FMC Board of Directors (the "Board") as there is legitimate reason to believe that a majority of the members of the Board lack the capability to make independent and/or disinterested decisions with regard to initiating and pursuing a proper legal action because a majority of the Board faces a substantial likelihood of liability for the misconduct alleged herein, among other reasons detailed below.

## II.    JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question pursuant to Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.  Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

### III.    PARTIES

#### A.    Plaintiff

20.    Plaintiff is a current holder of FMC stock and has been a continuous owner of FMC stock since at least 2020.

#### B.    Nominal Defendant

21.    Nominal Defendant FMC is a Delaware corporation with its principal offices located at 2929 Walnut Street, Philadelphia, Pennsylvania, 19104.  FMC's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "FMC."

#### C.    Individual Defendants

22.    Mark A. Douglas ("Douglas") served as FMC's President and Chief Executive Officer ("CEO") from June 2020 until June 2024.  Prior to these roles, Douglas served as the Company's President and Chief Operating Officer ("COO") from June 2018 until June 2020. During the Relevant Period, FMC paid Douglas $20,693,336.00 in total compensation. Additionally, while the price of FMC stock was artificially inflated due to the wrongdoing described herein, Douglas, while in possession of material nonpublic information ("MNPI") of that wrongdoing, sold a total of 19,093 shares of his personally held FMC stock for a total of more than $2 million in proceeds.  Douglas is named as a defendant in the Securities Class Action.

23.    Andrew D. Sandifer ("Sandifer") has served as FMC's Executive Vice President, Chief Financial Officer ("CFO"), and Treasurer since May 2018.  During the Relevant Period, FMC paid Sandifer $6,499,721.00 in total compensation.  Additionally, while the price of FMC stock was artificially inflated due to the wrongdoing described herein, Sandifer, while in possession of MNPI of that wrongdoing, sold a total of 16,580 shares of his personally held FMC stock for a total of more than $2 million in proceeds.  Sandifer is named as a defendant in the Securities Class Action.

6

24.     Pierre R. Brondeau ("Brondeau") has served as FMC's CEO since June 2024 and as Chairman of the Board since 2010.  Brondeau also served as FMC's CEO from January 2010 until May 2020 and as the Company's President from January 2010 until May 2018.  Currently, Brondeau also serves as Chair of the Board's Executive Committee.  During the Relevant Period, FMC paid Brondeau $780,135.00 in total compensation.  Additionally, while the price of FMC stock was artificially inflated due to the wrongdoing described herein, Brondeau, while in possession of MNPI of that wrongdoing, sold a total of 37,498 shares of his personally held FMC stock for a total of more than $4 million in proceeds.

25.     Eduardo E. Cordeiro ("Cordeiro") has served as a member of FMC's Board since 2011.  Cordeiro also serves as Chair of the Board's Audit Committee and a member of the Board's Executive Committee and Nominating and Corporate Governance Committee.  During the Relevant Period, FMC paid Cordeiro $560,135.00 in total compensation.

26.     Carol Anthony "John" Davidson ("Davidson") has served as a member of FMC's Board since July 2020.  Davidson also serves as Chair of the Board's Nominating and Corporate Governance Committee and as a member of the Board's Audit Committee.  During the Relevant Period, FMC paid Davidson $530,135.00 in total compensation.

27.     Kathy L. Fortmann ("Fortmann") has served as a member of FMC's Board since 2022.  Fortman also serves as a member of the Board's Compensation and Human Capital Committee and the Sustainability Committee.  During the Relevant Period, FMC paid Fortmann $490,135.00 in total compensation.

28.     K'Lynne Johnson ("Johnson") has served as a member of FMC's Board since 2013.  Johnson also serves as Chair of the Board's Compensation and Human Capital Committee and a member of the Board's Sustainability Committee.  During the Relevant Period, FMC paid Johnson

$524,468.00 in total compensation. Additionally, while the price of FMC stock was artificially inflated due to the wrongdoing described herein, Johnson, while in possession of MNPI of that wrongdoing, sold a total of 37 shares of his personally held FMC stock for a total of $4,617 in proceeds.

29. Patricia Verduin ("Verduin") has served as a member of FMC's Board since July 2023. Ms. Verduin also serves as a member of the Board's Compensation and Human Capital Committee and the Sustainability Committee. During the Relevant Period, FMC paid Verduin $173,088.00 in total compensation.

30. C. Scott Greer ("Greer") served as a member of FMC's Board from 2002 until April 2026. During the Relevant Period, Greer also served as the Board's Lead Independent Director and a member of the Board's Executive Committee. During the Relevant Period, FMC paid Greer $540,135.00 in total compensation.

31. Margareth Øvrum ("Øvrum") served as a member of FMC's Board from 2016 until February 2026. During the Relevant Period, Øvrum also served as a member of the Board's Nominating and Corporate Governance Committee and the Sustainability Committee. During the Relevant Period, FMC paid Øvrum $480,135.00 in total compensation.

32. Robert C. Pallash ("Pallash") served as a member of FMC's Board from 2008 until April 2026. During the Relevant Period, Pallash also served as a member of the Board's Audit Committee and the Sustainability Committee. During the Relevant Period, FMC paid Pallash $490,135.00 in total compensation.

33. Paul J. Norris ("Norris") served as a member of FMC's Board from 2006 until April 2023. During the Relevant Period, FMC paid Norris $308,421.00 in total compensation.

8

34.     Vincent R. Volpe, Jr. ("Volpe") served as a member of FMC's Board from 2007 until April 2023.  During the Relevant Period, FMC paid Volpe $310,088.00 in total compensation.  Additionally, while the price of FMC stock was artificially inflated due to the wrongdoing described herein, Volpe, while in possession of MNPI of that wrongdoing, sold a total of 1,694 shares of his personally held FMC stock for a total of $202,975 million in proceeds.

35.     Douglas, Sandifer, and Brondeau are at times referred to herein as the "Officer Defendants."

36.     Cordeiro, Davidson, Fortmann, Johnson, Verduin, Greer, Øvrum, Pallash, Norris, and Volpe are at times referred to herein as the "Director Defendants."

37.     Douglas, Sandifer, Brondeau, Cordeiro, Davidson, Fortmann, Johnson, Verduin, Greer, Øvrum, Pallash, Norris, and Volpe are collectively referred to herein as the "Individual Defendants" and, along with FMC, the "Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

38.     By reason of their positions as officers, directors, and/or fiduciaries of FMC and because of their ability to control the business and corporate affairs of FMC, at all relevant times, the Individual Defendants owed the Company and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage FMC in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of FMC and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to FMC and its stockholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

39.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of FMC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with FMC, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

40.     To discharge their duties, the officers and directors of FMC were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of FMC were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

41.     FMC also maintains a Code of Ethics and Business Conduct (the "Code of Conduct").  According to an introductory message included in the Code of Conduct from Brondeau, "[a]ll of us, including all employees, officers, directors and others who are bound by the Code, are responsible for becoming familiar with and abiding by the Code."  Further, in his introductory message, Brondeau states:

At FMC, we are committed to conducting our business with honesty and integrity and complying with all applicable laws. FMC's Code of Ethics and Business

10

Conduct ("Code") exemplifies our dedication to these high business standards. The Code summarizes the legal and ethical principles that we follow in our daily work and applies these principles to our policies and practices.

FMC's commitment to the Code starts at the top of the corporation. The FMC Corporate Responsibility Committee consists of senior management and reports to the Audit Committee of the Board of Directors. The Corporate Responsibility Committee assesses FMC's overall compliance with applicable law and the Code, oversees the compliance training program and considers the appropriate response to significant compliance matters and legal developments.

Law and standards vary in different countries and cultures, but, as a global company, our common goal and continuing commitment is to maintain equally high standards wherever we operate.

42.     Additionally, the Code of Conduct states the following in relevant part:

1. We are Committed to Ethical Behavior.

**Commitment to Ethics**
Ethical behavior is an individual responsibility. Behavior reflecting high ethical standards is expected of all directors, employees and others who are bound by the Code, regardless of position or location. No director, officer, manager or supervisor has the authority to violate or require conduct by another employee or any other person that violates the Code, other FMC policies or applicable law.

*       *       *

2. We Comply with the Code, Other FMC Policies, and All Applicable Laws.

We comply with the Code, other FMC policies and all applicable laws in conducting our business.

*       *       *

18. We Do Not Engage in Insider Trading or Related Unlawful Conduct

 Employees and directors may buy or sell the publicly traded securities of FMC and other companies. However, U.S. law prohibits the buying and selling of publicly traded securities by a person with insider information. Even minor violations of the securities laws can have severe consequences. Penalties include forfeiture of gains, civil penalties of up to three times the profit gained or loss avoided, prison terms, and large fines.

Insider trading rules apply to all kinds of securities, including common and preferred stock, bonds, commercial paper, options, and warrants. They apply to

11

direct buying and selling by the individual with knowledge and to tipping off a friend or family member who buys or sells.

People with inside information include:

- Officers, directors and employees of FMC who learn material, non-public information in the course of their job;

* * *

20. We Keep Accurate Company Records and Make Full, Fair, Accurate, Timely and Understandable Disclosures.

We make full, fair, accurate, timely and understandable disclosures in reports that FMC files under applicable laws, rules and regulations and in other public communications. Dishonest reporting, both inside and outside the company will not be tolerated. This includes reporting or organizing information in an attempt to mislead or misinform. No entry will be made on the company's books and records that intentionally hides or disguises the true nature of any transaction.

FMC has adopted controls to ensure the safeguarding of FMC assets and the accuracy of its financial records and reports in accordance with internal needs and requirements of applicable laws and regulations. These established accounting practices and procedures must be followed to assure the complete and accurate recording of all transactions. All employees, within their area of responsibility, are expected to adhere to these procedures, as directed by the appropriate FMC manager.

No employee or director may interfere with or seek to improperly influence, direct or indirectly, the auditing of FMC's financial records. Violation of these provisions shall result in disciplinary action up to and including termination, and may also subject the violator to substantial civil and criminal liability. . . .

43. In addition, FMC's Audit Committee, of which Cordeiro is Chair and Davidson is a member, has a responsibility to, among other things, assist the Board with monitoring the integrity of the Company's financial statements and the compliance by the Company with legal and regulatory requirements. The Company's Audit Committee Charter states, in relevant part:

A. <u>Review Procedures</u>

1. Meet to review and discuss with management and the independent auditor the annual audited financial statements, including disclosures made in Management's Discussion and Analysis and recommend to the Board

whether the audited financial statements should be included in the Company's Form 10-K.

2. Meet to review and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form 10-Q, including disclosures made in Management's Discussion Analysis, and the results of the independent auditor's review of the quarterly financial statements.

3. In connection with the reviews of the Form 10-K's and Form 10-Q's above, review and discuss with management and the independent auditor the following matters, as applicable:

a. Any analysis or other written communications prepared by management and/or the independent auditor setting forth significant issues regarding accounting principles, financial reporting, financial statement presentation, and judgements made in the preparation of the Company's financial statements, including analyses of the effects of Generally Accepted Accounting Principles ("GAAP") methods on the financial statements and any significant changes in the Company's selection or application of accounting principles;

b. Significant issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies;

\*       \*       \*

e. Disclosures made to the Committee by the Company's [CEO] and [CFO] regarding compliance with their certification obligations as required under the Sarbanes-Oxley Act of 2002 and the rules promulgated thereunder, and Company's disclosure controls and procedures and internal controls over financial reporting and evaluations thereof. The review of internal control over financial reporting shall include whether there are any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to affect the Company's ability to record, process, summarize and report financial information and any fraud involving management or other employees with a significant role in internal control over financial reporting.

\*       \*       \*

5. Discuss with management the Company's policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and risks related to cyber security; steps management has taken to monitor and control such exposures; and significant estimates

affecting the Company's financial statements, such as litigation, tax, and environmental matters.

6.    Review with management the Company's earnings press releases prior to public dissemination, including the use of "pro-forma" or "non-GAAP" financial information, as well as information and earnings guidance provided to analysts and ratings agencies. . . .

\*      \*      \*

D. Compliance and Other Matters

1. Review the Company's compliance with laws and regulations, including major legal and regulatory initiatives and review any major litigation or investigations against the Company that may have a material impact on the Company's financial statements.

\*      \*      \*

6. Establish and review procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

**a.    Conspiracy, Aiding and Abetting, and Concerted Action**

44.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

45.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

46.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or

14

negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

47. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of FMC, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

48. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

49. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of FMC and at all times acted within the course and scope of such agency.

## V. SUBSTANTIVE ALLEGATIONS[1]

### a. Company Background

50. FMC is a global agricultural sciences company with sales and operations broken out into four primary geographical regions: North America, LATAM, APAC, and EMEA. The Company's products include crop nutrition and seed treatment, as well as herbicides, fungicides, and its leading revenue-generator, insecticides. The Company invests in discovering new active

---

[1] Unless otherwise indicated, all emphasis is added.

ingredients, developing innovative formulations and biologicals in addition to advancing precision agriculture technologies that support sustainable agriculture around the world.

51. The Company utilizes authorized distributors to sell its products, though in certain circumstances, the Company sells directly to retailers and some large-scale farming operations.

b. **FMC Utilized Strict Credit Agreements to Fund its Operations**In order to secure financing for its operations, FMC entered into credit agreements that required the Company to maintain specific leverage ratios in order to avoid a default. This included a Fourth Amended and Restates Credit Agreement (the "Fourth Credit Agreement") that the Company entered into on May 26, 2021, which provided for a "$1.5 billion revolving credit facility . . . with an option, subject to certain conditions and limitations, to increase the aggregate amount of the revolving credit commitments to $2.25 billion." The Fourth Credit Agreement further required the Company to maintain a leverage ratio of no more than 3.75:1.00 as of the end of each fiscal quarter until September 30, 2021, after which, FMC was required to maintain a leverage ratio of 3.50:1.00.

53. Further, on June 17, 2022, FMC entered into a Fifth Amended and Restated Credit Agreement (the "Fifth Credit Agreement"). The Fifth Credit Agreement offered a $2.0 billion to $2.75 billion revolving credit facility but required FMC to maintain a leverage ratio of no more than 3.50:1.00.

c. **FMC Acquires "Transformative" Diamide Products**

54. In 2017, FMC purchased the rights to two diamide insecticide products from Dupont for $1.2 billion. According to the Company, the purchase of these two products, called Rynaxypyr and Cyazypyr, would be transformative to the Company, with the potential to generate

16

billions in revenue and permit FMC to establish itself as one of the largest agricultural companies in the world.

55.    The acquisition of Rynaxypyr and Cyazypyr included ownership over multiple patents associated with the Diamide Products, including: (i) Composition of Matter Patents, which "[p]rotect[ed] [the] proprietary molecular structure of the active ingredient and the molecular structure of certain intermediates"; (ii) Process Patents, which "[p]rotect[ed] the manufacturing processes for the active ingredient and the key intermediates used to make the active ingredient"; (iii) Formulation patents, which "[p]rotect[ed] product formulations that use[d] the active ingredient"; (iv) Use Patents, which "[p]rotect[ed] how a product containing the active ingredient [was] used"; and (v) Application Patents, which "[p]rotect[ed] the methods or approaches to apply products containing the active ingredient."  Additionally, according to FMC, global regulations offered further intellectual property protection for the Diamide Products.

56.    On March 31, 2017, FMC issued a press release announcing the acquisition of the Diamide Products.  Then during a conference call with analysts and investors held the same day, Brondeau provided the following information about the acquisition in relevant part:

> This acquisition will significantly expand our commercial portfolio, including the market-leading insecticide Rynaxypyr and Cyazypyr and indoxacarb.
>
> *        *        *
>
> **We believe Rynaxypyr is the single-largest IP-protected crop protection molecule on the market today.**
>
> *        *        *
>
> **This is a pivotal transaction for FMC as it transforms the company into a Tier 1, innovation-based crop protection company,** the fifth largest in the world, by revenue, once all the current consolidation is complete. But this transaction is not exciting simply because it increases our size. **We are equally excited that we're acquiring a portfolio of market-leading products** and a work-class R&D

17

organization. ***Together, the performance of our Ag Solutions business will be transformed in both the near and long term.***

### d. Despite FMC's Purported Growth Potential, the Company Faced Significant Reductions in Demand in the Wake of the COVID-19 Pandemic

57. During the COVID-19 pandemic, supply chains across the globe were strained. This resulted in significant disruptions and delays in acquiring products, including in the agricultural sector. As a result, many distributors, retailers and end-users, attempting to avoid supply chain disruptions, over-bought FMC products through 2021, stockpiling large amounts of excess inventories.

58. While the spike in demand was initially a boom for FMC, it was transitory and did not represent a stable and permanent baseline for product demand. As the COVID-19 pandemic subsided post-2021, customers were left with a glut of products that could not quickly be disposed of. In some cases, it would take months or years for customers to sell or use the products they had amassed during the pandemic. This included FMC's lauded Diamides Products. As a result, many FMC customers simply quit purchasing new products as they worked through their stockpiles. This in turn led to a marked decline in demand for FMC's products in 2022 and 2023 and ultimately, a significant reduction in revenues. This impact on revenues was further exacerbated when FMC began offering steep discounts, extended extraordinary credit, and provided protracted payment terms in an effort to persuade customers to continue purchasing products.

59. Additionally, the massive over-purchasing of products also led to a variety of negative outcomes apart from just the reduction in demand. For instance, as the COVID-19 pandemic subsided post-2021 and supply chains returned to normal, many FMC customers who had over-purchased, put pressure on FMC to return their excess inventory. Worse still, many of the products that had been over-purchased were beginning to reach their expiration dates, leading

18

to customers demanding FMC take back products that could no longer be resold by the Company. These knock-on effects of the pandemic-related buying sprees further negatively impacted FMC's revenue prospects.

60.     Yet despite the obvious reduction in demand and the corresponding risk to FMC's revenues, the Individual Defendants concealed these risks from the investing public, instead touting FMC's growth potential and portraying its sales channels as healthy.

        **e.  As Demand Faltered Due to Packed Channel Inventories, FMC Also Faced Significant Global Crisses That Further Eroded the Company's Revenue Prospects**

61.     As FMC was facing a decline in demand for its products due to excess inventory in and after 2022, the Company was also facing an increase in generic competition for certain of the Company's most lucrative products, including the Diamide Products.  These emerging legal and at times, illegal competitors, substantially impacted FMC's sales.

62.     By mid-to-late 2022, FMC had begun experiencing material and undisclosed legal setbacks that negatively impacted the Company's ability to maintain patent exclusivity for its Diamide Products.  For example, on September 12, 2022, the China National Intellectual Property Administration ruled that FMC's process patent for an intermediate chemical used in the production of Rynaxypyr was invalid and unenforceable.

63.     Then, on September 16, 2022, a court in Brazil, FMC's largest market in the LATAM region, called on three agencies to conduct regulatory assessments of a generic form of Rynaxypyr, produced by a Chinese competitor, Rainbow Agro, that were a precursor to permitting the competitor product to be marketed and sold in Brazil.

64.     Further, on September 19, 2022, the Delhi High Court in India ruled against FMC in litigation with Natco Pharma ("Natco"), a large, well-capitalized generic competitor to FMC.

19

Natco had been seeking to manufacture a generic substitute of Rynaxypyr. The Court vacated an injunction previously obtained by FMC and soon after, Natco announced the launch of its generic competitor, Natgen, in the Indian market. On December 5, 2022, the High Court of Delhi denied FMC's appeal of the September decision.

65. Subsequently, on November 14, 2022, the Delhi High Court again handed down a ruling against FMC, this time permitting another FMC competitor, GSP Crop Science to begin marketing a generic competitor for Rynaxypyr in India. In its ruling, the Court described FMC's litigation strategy as "nothing but an attempt by the Plaintiffs to extend their monopoly." The Court further found that FMC had engaged in improper conduct, and was "guilty of suppressing material facts and misleading the court and also the patent office," and "clearly points towards an attempt for evergreening [Rynaxypyr]. . . even though, the product patent for the same has expired and therefore, has fallen into public domain."

66. These legal losses around the world presented a significant setback to FMC's stated strategy of vigorously defending its intellectual property, particularly with respect to its Diamides Products. Yet despite the fact that these losses were precursors to the encroachment of a myriad of generic competitors to FMC's core products, the Individual Defendants failed to disclose any of these issues to the investing public.

67. Finally, a third issue threatening FMC's business between 2021 and 2023 was a proliferation of industry consolidation among FMC's distributors that increasingly favored FMC's competitors. Additionally, many distributors began marketing their own generic alternatives to FMC's products, further undercutting the Company's business. As such, distributors often had additional incentives, and greater power, to push FMC's competitors to retail.

20

68.     Despite the emergence of these serious industry-wide threats to FMC's fundamental revenue generation capabilities, the Individual Defendants continued to obfuscate the truth by concealing these issues, instead portraying the Company's channel inventories as healthy and its financial prospect as strong.

### f.    The Individual Defendants Issue Materially Misleading Statements

69.     Throughout the Relevant Period, the Individual Defendants made, or otherwise caused the Company to make, a series of materially false and misleading statements that served to conceal that: (i) due primarily to COVID-19 supply chain disruptions, many of FMC's distributors and retailers had accumulated significant amounts of excess inventory; (ii) this oversupply led to substantial reductions in global demand for FMC's products in 2022 and 2023; (iii) as a result, FMC's margins began to suffer as the Company attempted to encourage sales by offering discounts, and many of the products that were pre-purchased during the COVID-19 pandemic expired, leading to widespread product returns; (iv) demand for the Company's products, including its flagship Diamide Products, also suffered due to the introduction of low-cost generic alternatives into key markets across the world; and (v) FMC's revenue growth was further weakened by industry consolidation, as many consolidated distributors had financial incentives to promote competitors' products at retail.

70.      On February 8, 2022, FMC issued a press release, filed with the SEC on Form 8-K, that disclosed purported "record quarter results," driven by "***strong demand*** and pricing actions."  The release further touted that "new products continued market expansion of Rynaxypyr and Cyazypyr."  Further, according to a statement in the release from Douglas, the Company's financial results, "reflect[] the strength of our synthetic and biological portfolios, ***a healthy***

*demand environment* as well as accelerating price increases."  Douglas went on to tout that "[r]evenue growth was particularly robust in North America and Latin America."

71.    The next day, February 9, 2022, the Company hosted an earnings call with analysts and investors to discuss the Company's fourth quarter 2021 earnings.  During the call, Douglas indicated that "*[o]ur Asia business is expected to grow across several countries driven by diamides*, new products and biologicals. *India will continue to be an important market for our diamides* as well as the broader portfolio, especially in sugarcane, rice and specialty crops."

72.    During the same call, in response to a question regarding "channel inventories," Douglas claimed that "from a volume perspective . . . there's obviously—**there's very, very strong demand out there**."  Douglas then went on to state the following in relevant part:

> I think *from a market demand perspective, it's very strong all over the world. I mean when I think about channel inventories today, frankly, I have very, very few concerns from where I sit at FMC.* There are pockets in India following the spotty monsoon that we had last year, but they're not significant. *Brazil, we have—from FMC's perspective, we got absolutely 0 concern.* From North America and probably the other way around when it comes to channel inventories, I'm more concerned that there is not enough material there. Europe, not really a problem at all. *So channel inventories, frankly, in our own internal conversations has not really come up much in the last quarter. Demand has come up. Demand is very, very strong.*

73.    Douglas was then asked during the call about FMC's growth expectations, specifically with respect to Diamide Products.  In response, Douglas stated in relevant part:

> I think what is most pleasing for us is we see the diamides continuing to grow in that mid- to high single-digits depending on the year, that keeps rolling through. We see that year in, year out since we acquired the products.

74.    On February 25, 2022, FMC filed its Annual Report with the SEC on Form 10-K for the year ended December 31, 2021 (the "2021 10-K").  The 2021 10-K was signed by Sandifer, Brondeau, Douglas, Cordeiro, Davidson, Greer, Johnson, Norris, Øvrum, Pallash, and Volpe.  The 2021 10-K included standard warnings regarding risks related to competition:

22

*Our business faces competition, which could affect our ability to maintain or raise prices, successfully enter certain markets or retain our market position. Competition for our business includes not only generic suppliers of the same pesticidal active ingredients* but also alternative proprietary pesticide chemistries and crop protection technologies that are bred into or applied onto seeds. *Increased generic presence in agricultural chemical markets has been driven by the number of significant product patents and product data protections that have expired in the last decade, and this trend is expected to continue. . . . At this time, the scope and potential impact of these technologies are largely unknown* but could have the potential to disrupt our business.

75.     This generic risk disclosure was materially misleading because, while it presented competition-based risks as hypothetical, such risks had, in fact, already materialized.  Specifically, competition was already impacting the Company's "ability to maintain or raise prices" or to "retain [] market position."

76.     The 2021 10-K also contained materially misleading risk disclosures related to the Company's efforts to protect its intellectual property:

Our future performance will depend on our ability to address active ingredient composition of matter patent expirations through effective enforcement of our patents that continue to cover key chemical intermediates and process patents, as well as portfolio life cycle management, particularly for our high value diamide insecticides. . . *Some of our competitors may secure patents on production methods or uses of products that may limit our ability to compete cost-effectively.*

\*       \*       \*

*The composition of matter patents on our Rynaxypyr® active ingredient is nearing its expiration in several key countries. We have a broad estate of additional patents regarding the production of Rynaxypyr® active ingredient, as well as trademark and data exclusivity protection in certain countries that extend well beyond the active ingredient composition of matter patents. . . . Other third parties may seek to enter markets with infringing products or may find alternative production methods that avoid infringement or we may not be successful in litigating to enforce our patents due to the risks inherent in any litigation. . . . We are currently and may in the future be a party to various lawsuits or administrative proceedings involving our patents.* (See "Patents, Trademarks and Licenses" in Item 1.). Such challenges can result in some or all of the claims of the asserted patent being invalidated or deemed unenforceable. *In such circumstances, an adverse patent enforcement decision which could lead to the entry of*

23

*competing chlorantraniliprole products in relevant markets may materially and adversely impact our financial results.*

77.     On March 8, 2022, FMC attended the RBC Capital Markets Chemicals and Packaging Conference.  During the conference, Douglas stated that "[c]hannel inventories for us are normal, if not low in some parts of Latin America."  Douglas went on to state in relevant part:

> *We've had very strong demand. A lot of that demand was used during the season, which is always a very good sign.* So I think with soft commodity prices as they are, you're going to see that trend pretty much everywhere in the world where products are getting used to make sure that the growers are getting the highest yields they possibly can. When you have record prices for soy, corn, wheat and you name your crop, cotton, sugar, they're all up there. People really want to protect those crops. *So we see that demand side being very strong.*

78.     On May 3, 2022, FMC filed its Quarterly Report with the SEC on Form 10-Q for the first fiscal quarter of 2022 (the "1Q22 10-Q").  The 1Q22 10-Q was signed by Sandifer and contained certifications signed by Douglas and Sandifer pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy and completeness of the 1Q22 10-Q.  The 1Q22 10-Q incorporated by reference the materially misleading risk disclosures regarding increased competition and the Company's ability to protect its intellectual property that were contained in the 2021 10-K.

79.     Also on May 3, 2022, FMC hosted an earnings call with analysts and investors to discuss the Company's first quarter 2022 earnings.  During the call, Douglas was questioned about the Company's channel inventories and the "good amount of prebuying in a lot of different regions ahead of maybe an expectation of additional price increases, concerns around supply chain."  In response, Douglas stated in relevant part:

> *Generally speaking, we are not concerned about channel inventories. There are a couple of pockets in the world. One we alluded to, which is India.* In Q4, weather patterns were not great, and there is a reduction in rice acres in India, and you saw some of the comments about strong growth in ASEAN and Australia offset by India. *We're taking the opportunity to reduce our channel inventories in India at*

*the beginning of the year. We expect that to normalize pretty quickly as we go through the first half year.* Outside of that, *Northern Hemisphere, I don't think we'll carry in excess inventories as we're going into the channel into the seasons.*

*   *   *

*So we're not seeing anything that we would say is concerning at all. They seem pretty normal to us. In Latin America, for us, normal. Argentina, Brazil, Mexico, India where we should be at this point for the season, demand has been very good for us.* Our growth rates are in line with how we're penetrating the market. You'll recall on the call here, I just talked about the fact that we've been spending a lot of time and effort improving our market access into the soy complex in Brazil, and that's where our growth is coming from, whether it be with insecticides or some of the new herbicides that we have in place. *We're not worried about where our inventory levels are at all in Brazil or Argentina.*

80. During the same call, BNP Paribas analyst, Laurent Guy Favre, asked Douglas "if you could talk a little bit about, I guess, volumes including mix, so really intensity of use. Are there reasons why you could not expect the higher intensity of use, more spraying[?]" In response, Douglas stated in relevant part:

*[O]ur backdrop is positive. [W]e believe markets will continue like this, certainly this year and probably into next year as well. We don't see anything on the horizon that will change that.* So from our perspective, it is making sure that we can get those high-quality, newer technologies to the marketplace, certainly in the right time frame given all the disruptions we're seeing.

81. On May 4, 2022, FMC attended the Wells Fargo Industrials Conference. During the conference, Sandifer was asked about demand for the Company's products in the United States. In response, Sandifer stated the following in relevant part:

*The U.S.—look, the U.S. market is still going gangbusters. We'll see how planning continues to proceed in early season, but it's been a good start to the season. We had very robust sales growth in both Canada and the United States in the first quarter,* and it is one place that I would know we definitely saw some advanced purchasing, all within the season for products that should be used within this growing season, but that blurring between Q2 and Q1.

25

82.     Further, during the conference Sandifer acknowledged that demand was unusual for the season, but assured that the Company expected to sustain that level of demand "for several years":

> Certainly, there were highlighted concerns among retailers, distributors and growers on availability of materials. So we did see some early plays in the orders, and quite honestly, we had a very, very strong Q1. We could have sold more, but we ended up with more demand particularly for products that aren't quite—it's not quite the time for them to usually be consumed that we weren't prepared to produce just yet. That demand has been very, very strong. ***We see those conditions continuing. . . . And we see a pretty good market in the U.S., not only for this year but for several years.***

83.     On May 18, 2022, FMC attended the BMO Capital Markets Global Farm to Market Conference.   During the conference Douglas was questioned about the Company's channel inventory position.  In response, Douglas stated the following in relevant part:

> ***[I]nventories are where they should be right now.*** We had a very—FMC had a very strong Q1, but we know some of that came from Q2 because people are just concerned about supply. Rightly so with what's happening in the chemical industry and the broader industry in general. ***I think inventories are in good shape. The only one we highlighted at our February call, which we're working through now, is parts of India. There was less rice acres given the seasonal weather,*** the monsoon in Q4. ***So we had more inventory as FMC, and I'm sure others did as well, but everywhere else is in pretty good shape.***

84.     During the same conference, an analyst noted that FMC had lacked visibility into inventories in the past, particularly in Brazil and inquired what the Company was doing differently. In response, Douglas stated the following in relevant part:

> Today, we have a system that is very different. We manage inventory not only in our own facilities, not only in third-party warehouses but also at the grower level. So our sales force and our financial groups are actually lockstep in terms of how much production are we selling into the market? How much is actually getting through to the grower? And then importantly, how much is getting used on the ground? So the system is completely different to what it was 7, 8, 9 years ago in terms of how we manage inventory in Brazil.

26

85.    Douglas also indicated that "*right now, as I said earlier, there are no issues with inventory in Brazil for us.*"

86.    Then, in response to a question regarding FMC's EBITDA and revenue targets, Douglas stated, in relevant part:

> *I mean we put our plan together back in 2018 after we acquired the DuPont assets, and we had really an algorithm that said 5% to 7% top line growth, 7% to 9% EBITDA growth and then EPS growing faster than EBITDA. We're generally on—we're right the range for revenue.* We're slightly below in terms of EBITDA, but we've had $1 billion of costs and FX that we didn't have in the plan. *So I feel very good where the company is.* I think this year, we're at 6% EBITDA growth. So we're right at the range. It's a very attractive algorithm. When you think of a company like us, $5.5 billion in revenue, $1.4 billion in EBITDA, we're in a $65 billion market. We're a research company. We're applying 6% to 7% of our revenue into that model for R&D. You should be growing your EBITDA faster. And we have been. *So I think that model is very much intact.*

87.    Douglas also promoted the Company's "very strong demand" during the conference, stating in relevant part:

> We're managing through a very volatile environment. We all know that. That will change as we go through the rest of the year and into next year, that should change. But *the way the company is performing, dealing with all the activities that are out there, very strong demand, pricing actions where we delivered 8% price in the quarter, roughly mid-single-digits for the full year to offset costs. I think the company is performing at a very high level.* So we were surprised when we saw the stock go down. It's come back, not quite to the point that it was. But I think people are missing the fact that the company is performing at a high level. We have 26%, 27% EBITDA margins. There is nobody in the industry growing at 7% to 8% on the revenue line with those sort of EBITDA margins, despite the significant cost inflation that we've got.

88.    On August 3, 2022, FMC filed its Quarterly Report with the SEC on Form 10-Q for the second quarter of 2022 (the "2Q22 10-Q"). The 2Q22 10-Q was signed by Sandifer and contained certifications signed by Douglas and Sandifer pursuant to SOX attesting to the accuracy and completeness of the 2Q22 10-Q. The 2Q22 10-Q incorporated by reference the misleading

risk disclosures regarding increased competition and the Company's ability to protect its intellectual property that were contained in the 2021 10-K and the 1Q22 10-Q.

89.    Also on August 3, 2022, FMC hosted an earnings call with analysts and investors to discuss the Company's second fiscal quarter earnings.  During the call, Douglas responded to a question regarding the Company's inventory levels, stating in relevant part:

> *We're very ok with inventory levels pretty much everywhere in the world right now.* I would say the only spot and I've commented on this at the last earnings call is there has been a significant reduction in rice acres in India. *And we're working through inventory in India. That will be done as we go through the second half of the year. Everywhere else, frankly speaking, is very good from our perspective on inventory. So we're not worried about that going into the end of the year.*

90.    During the same call, Douglas was asked about revenue streams from the Diamide Products coming from FMC-branded products versus FMC's third-party partners.  In response, Douglas indicated that 60% of the revenue came from FMC-branded products, stating further that:

> I think the most important takeaway that you should take away from this conversation is the 40% as it grows, does not take away from the 60% as we grow. *It's an expansion of the market pool for the diamides . . . we see the diamides taking share from a number of older chemistries, whether they be neonicotinoids, some of the pyrethroids, and certainty some of the [carbonates] around the world.*

91.    On November 1, 2022, FMC issued a press release, filed with the SEC on Form 8-K, disclosing the Company's financial results for the third quarter of 2022.  The release included a statement from Dougles in which he touted that "*FMC's strong growth continued in the third quarter driven by a robust start to the Latin American season* and continued pricing actions across all regions."  Additionally, with regard to the Company's LATAM segment, the release indicated that regional sales "grew 35 percent year-over-year *driven by strong herbicide and insecticide demand*" and that, "*In Brazil, FMC is reaping the benefits of investing in expanding market access for its products*."

28

92.     The next day, November 2, 2022, FMC hosted an earnings call with investors and analysts.  During the call, Douglas stated that "***demand remains strong for new products based on the diamides and other chemistries***, and FMC continues to make significant progress by improving our market access in geographies where we are underrepresented."  Further, Douglas remarked in relevant part that:

> Pricing momentum and volume growth are expected to more than offset FX headwinds in the quarter. We have good visibility into demand for the quarter with **strong order books for both the Brazilian and US markets.** Cost increases are forecasted to be lower in Q4 compared to Q3. ***The combination of sales growth and lower cost headwinds is anticipated to result in EBITDA growth of 15% at the midpoint*** with EPS up 9% at the midpoint year-over-year.

93.     Then, in response to a question regarding growth rates for Diamide Products, Douglas stated that "[t]his year, year-to-date, we're up in the high mid-single digits. ***We would expect that same growth rate next year as we go forward. We're getting new registrations, especially for Cyazypyr. That market is growing rapidly in many parts of the world, which is good news.***"

94.     During the same call, Douglas was also questioned about FMC's inventory levels. In response, Douglas claimed that rather than inventory being an issue that impacted the Company across all regions, there were only "pockets" of higher inventories.  Further, Douglas attributed these "pockets" to weather conditions and maintained that "generally speaking, overall, we would say we're happy where inventory levels are."  Specifically, in relevant part, Douglas claimed that:

> ***Well, I think generally speaking, overall, we would say we're happy where inventory levels are in the marketplace.*** There are pockets of higher inventories. We talked about India before. The last few years, with the weather monsoons played out and rice acreage reductions, have not been great. So we're working through inventory there.
>
> ***I would say in the U.S., things are fine.*** Europe is pretty okay for us. 1 or 2 pockets in the South because of dry weather that we had last year. ***I would say in Latin America, there are parts of Brazilian market where they had a drought last year***

*that you can imagine inventories are high. Inventories are high right now in Brazil because we're in the planting season. But we're happy with where our inventories are right now.*

95.    On the same day, November 2, 2022, FMC filed its Quarterly Report with the SEC on Form 10-Q for the third quarter of 2022 (the "3Q22 10-Q"). The 3Q22 10-Q was signed by Sandifer and contained certifications signed by Douglas and Sandifer pursuant to SOX attesting to the accuracy and completeness of the 3Q22 10-Q. The 3Q22 10-Q included a misleading risk disclosure concerning the Company's ability to protect its intellectual property, specifically mentioning FMC's patent litigation in China and representing that "we do not believe that the China Patent Review Board's decisions would materially adversely impact our enforcement of similar patents in other countries." In relevant part, the 3Q22 10-Q stated that:

> *The composition of matter patents on our Rynaxypyr® active ingredient are nearing their expiration in several key countries. We have a broad estate of additional patents regarding the production of Rynaxypyr® active ingredient, as well as trademark and data exclusivity protection in certain countries that extend well beyond the active ingredient composition of matter patents*. . . . We intend to strategically and vigorously enforce our patents and other forms of intellectual property and have done so already against several third parties. *Other third parties may seek to enter markets with infringing products or may find alternative production methods that avoid infringement or we may not be successful in litigating to enforce our patents due to the risks inherent in any litigation. . . . We are currently and may in the future be a party to various lawsuits or administrative proceedings involving our patents.* Such challenges can result in some or all of the claims of the asserted patent being invalidated or deemed unenforceable. Two such proceedings in China are currently on appeal. . . . *In such circumstances, an adverse patent enforcement decision which could lead to the entry of competing chlorantraniliprole products in relevant markets may materially and adversely impact our financial results.*

*     *     *

> As noted in our 2021 Form 10-K, in early 2022, we received notice that certain third parties were seeking to invalidate our Chinese patents on a certain intermediate involved in producing chlorantraniliprole and a process to produce chlorantraniliprole; we intend to defend vigorously the validity of both patents. During the third quarter of 2022, the China Patent Review Board issued rulings which held that the two challenged patents were not valid in China. We believe the

30

Review Board's decisions are seriously flawed both on a procedural and substantive ground and we have filed appeals. Under Chinese law, the patents remain valid but are not enforceable pending appeal. ***Given the unique and specific Chinese patent law issues at issue in that situation, we do not believe that the China Patent Review Bord's decisions would materially adversely impact our enforcement of similar patents in other countries.***

The composition of matter patent that covers chlorantraniliprole (also known as Rynaxypyr® active) expired in number of countries in August 2022; this patent will continue to remain in force in other countries throughout the world, expiring on a country-by-country basis at various dates through 2027. As described in our 2021 Form 10-K, ***we are deploying a multi-pronged strategy to defend that business after active ingredient patent expiration, including enforcement of our patents in many countries which continue to cover chemical intermediates and manufacturing processes that are essential in the production of chlorantraniliprole.***

96.     The 3Q22 10-Q also incorporated by reference the misleading risk disclosure related to increased competition that was included in the 2021 10-K and the Company's previously filed quarterly reports.

97.     On November 8, 2022, FMC attended the Morgan Stanley Global Chemicals, Agriculture and Packaging Conference.   During the conference Sandifer made the following remarks in relevant part:

We're also growing really rapidly. At the midpoint of our guidance for the full year, we're growing 13% in sales. We raised our guidance $100 million for revenue for the full year for essentially for the fourth quarter. . . . Similarly, as we've discussed, ***we're expecting a pretty robust demand environment going into next year.*** So we're actually building inventory slightly in addition to dealing with just the inflationary impact on inventory values. ***But we're actually building and maintaining inventory despite the higher sales so that we're well prepared to go into Q1 and early Q2 with material.***

98.     During the conference, Sandifer also spoke to FMC's ability to meet its long-term growth targets, stating in relevant part:

We sketched out—we're going into the fifth year of our 5-year plan, the 5-year strategic plan we launched in 2018 after digesting the acquisition of the DuPont assets. First time in my career in the chemical industry, we've made it to the 5th year of a 5-year plan. So I think that says something about the strength of the

31

platform despite all the volatility that we've seen in the world in the last several years. *But we're very excited about the ability to continue growing at a market—above market level. So we could use that same range at 5% to 7% top-line growth as a guidepost, which would be a significant premium at the overall market. And that's driven by both volume and pricing.*

\* \* \*

I think from a profit perspective, we're also very optimistic and particularly looking to return to our expectations of the bottom line growing substantially faster than the top line. *In our long-range plan, we had this algorithm, if you will, of growing the top line 5% to 7% and growing the bottom line 7% to 9%. And we think that's kind of a range that's well within reach for 2023 for the company.*

99.     On February 7, 2023, FMC issued a press release, filed with the SEC on Form 8-K, disclosing the Company's fourth quarter and full-year 2022 financial results.  The release reported revenues of $5.8 billion, "reflecting 15 percent growth," Adjusted EBITDA of $1.407 billion, and Free Cash Flow of $514 million and attributed its "record fourth quarter and full-year 2022 results" to "*robust volume and strong pricing*."

100.    The release also included a statement from Douglas in which he touted that "FMC delivered record performance in the fourth quarter, *driven by robust volume growth*, continued strong pricing actions as well as growth of new products."  Douglas further stated that "*North America delivered exceptional revenue growth, with Latin America and Europe, Middle East and Africa (EMEA) posting strong gains.*"

101.    Further, in the release Douglas also stated in relevant part that:

Full-year results were driven by significant volume and pricing gains in every region. Our continued focus on new product development, commercial launches and market access investments delivered record results in 2022. More than $600 million in revenue was from new products introduced in the last five years, an increase of over 50 percent from the prior year, and approximately $100 million in revenue from launches in 2022.

102.    Regarding FMC's 2023 outlook, the release indicated that "full-year 2023 revenue is forecasted to be in the range of $6.08 billion to $6.22 billion, representing an increase of 6

32

percent at the midpoint versus 2022, *driven by strong pricing in all regions and growth in volume driven by new launches and market access*." The release further stated that the "*2023 outlook reflects pricing momentum and robust demand*."

103.    Finally, in the release, Douglas stated the following in relevant part:

We anticipate a positive market backdrop for 2023 that will support our pricing actions *as well as continued healthy demand for FMC's synthetic and biological product portfolios*. . . . we will continue to closely manage our supply chain in 2023 to take advantage of any cost improvement opportunities while ensuring product availability for our customers.

104.    The next day, on February 8, 2023, FMC hosted an earnings call with analysts and investors to discuss the Company's fourth quarter 2022 earnings. During the call, Douglas was questioned about inventory levels in the U.S., Brazil, and Argentina, to which he responded in relevant part:

Yes. I think—so *from a North American perspective, U.S. in particular, I think channel inventories are a little bit elevated right now, but that's normal.* I would say, as you enter the season, most of retail and distribution is stocked up for a very good year. When I think of inventory levels for FMC compared to our sales on a percent basis, we're about the same place we were the year before. So I think it's pretty normal.

Brazil and Argentina, a different story. Forget the nonselective that we just talked about. I think because of the conditions that we saw in the south of *Brazil and in Argentina, it was very dry in the fourth quarter. I have no doubt that there is elevated channel inventories in that area, would not be a surprise at all.*

*If I run around the rest of the world, Europe, South of Europe is high again because of hangover from the last season. Northern Europe is pretty much okay, I think. In Asia, we've talked about India in the past. The weather didn't help again in 2022. So we see high channel inventories in India, which we'll be working through. Parts of Indonesia are similar, somewhat high. Rest of Asia is good. So overall, it's pretty much what you would expect.*

105.    During the same call, Douglas was also asked about growth expectations for the Diamide Products over the next few years. In response, Douglas stated in relevant part:

33

I think we've said in the past, sort of that mid-to high single digits is where we think it will pan out over time. I wouldn't change that view right now. *We do continue to launch new diamide formulations around the world, and Cyazypyr is growing very nicely as we get the new registration. So I think the mid-to high single digit is a perfectly good range of legacy.*

106.     On February 21, 2023, FMC attended the Citi Global Industrial Tech and Mobility Conference.    During the conference, Sandifer was questioned about "patent expirations on diamides. . . and what [you can] do to extend a life."  In response, Sandifer stated in relevant part:

[J]ust to give you the big picture, the diamides, Rynaxypyr and Cyazypyr, we have 30 patent families included about 1,000 patents, both granted and applied for that cover [a] broad array of issues that protect the diamides. The one that gets the most initial focus is the composition of matter patents, is literally the patent on the molecule itself. Some of those patents have already started to expire for Rynaxypyr. In fact, in several countries, China, India and certain Eastern European countries, the patent for Rynaxypyr expired in 2022.

Now, *that's just one of a small part of the total layer of protections we have around these molecules.* We also have patents on the manufacturing process to make Rynaxypyr and Cyazypyr. We have patents on the intermediates, the composition amount of patterns on the intermediate materials that are used in that process. So for example, for Rynaxypyr, it's a 16-stage synthesis process.

Many of the intermediate steps and the chemicals that are produced there really have no other use than for making Rynaxypyr. We have patents on their composition of matter. We have patents on the process to make several of those as well. We also have patents on formulations on how that product is finally formulated to take to market. So we've had this broad set of patent protections. We are also provided some protection to the use of our regulatory data and the way registrations are managed in different countries. *They give us protection that continues well until the end of this decade and, in some cases, a bit longer.*

And certainly, with—speaking directly to Rynaxypyr, which has earlier expiration dates, Cyazypyr goes a little bit further. But as you pointed to, P.J., *it's not just relying on the patents themselves. And obviously, we've been very aggressive in enforcing the patents. We have won cases for infringement in both China and India and continue to aggressively defend our patents.* But we've also engaged partners and brought other people in the business ahead of any kind of patent expiration. We don't believe that in our industry, in crop protection, that there really is a patent cliff. It's more of a long plateau as you transition from being a fully patented to a post-patented life.

107.    Further, Sandifer stated the following in relevant part in response to a question about the Company's inventory levels:

Yes. I mean, certainly, when we talk about inventories, a lot of the focus is on the inventory that's on the channel so downstream from us and our direct customers, whether that be distributors or retailers or growers depending on the market that we're in. Going around the world, let's say, *we'll start with Latin America because I think you highlighted one of the hot points. There was a drought and very dry conditions in Southern Brazil and Argentina at the beginning of the growing season in October, November. Some acreage was pulled out of production. There is some lost volume there. So because of that, there is a bit of channel inventory, and something were very conscious of and managing closely.* I would say there has been improvement in precipitation over the past months. Some of that business is just lost. You're not going to pick it back up. Some of it may recover.

Rest of Brazil is actually in pretty good shape. So it's really the southern part of Brazil and Argentina that are the hotspot. When I look at the rest of the Americas, the U.S. market and Canada, Canada is still a little early. *In the U.S. market, there is a lot of product in the channel because there should be a lot of product in the channel. Planning season starts here in another 4 weeks or so. You need that product in place.* So for example, preemergent herbicides, which are an important product line for us. You put those now at or before planting. That's the—*now is the time to have that product in the channel. So I think, from our own estimation and analysis, that levels of channel inventory are in line with the level of sales we've been having.*

Going around the rest of the world, in Asia, we marked on the call and our most recent earning call highlighted in India. *India is another place where we have a little bit of a backup of channel inventory. We have 3 years in a row of sort of uneven or weak monsoons.* And I'm not a weather forecaster. I just—I do know that at some point you revert to me whether that's this year or next year. We went through a similar issue with Australia several years ago. We had a number of years of really pronounced drought. Now they've sort of reversed the threat, and it's a bit of flooding. So I think, this year, India, which is our third largest country, is not likely to be big contributor to growth as we try to manage through that channel inventory.

*Europe, generally speaking, pretty good shape.* There's a few spots in Southern Europe where there's some pretty hot and dry weather last year. *There's a little bit of inventory in the channel, but it's not significant.*

108.     Sandifer was then asked whether he was "concerned overall" about "some pockets" of heightened inventory.  In response, Sandifer stated, "***No. No, I think we're managing. I think we know where the issues are, and we're going to manage it proactively.***"

109.     On February 24, 2023, FMC filed its Annual Report with the SEC on Form 10-K for the year ending December 31, 2022 (the "2022 10-K").  The 2022 10-K was signed by Sandifer, Brondeau, Douglas, Cordeiro, Davidson, Fortmann, Greer, Johnson, Norris, Øvrum, Pallash, and Volpe.  On the issue of FMC's patents, the 2022 10-K included the following in relevant part:

> ***During 2022, we initiated proceedings to enforce several of our patents and trademarks against generic producers and infringers, resulting in multiple favorable judgements and settlements, including in India and China.*** In early 2022, we received notice that certain third parties are seeking to invalidate our Chinese patents on a certain intermediate involved in producing chlorantraniliprole and a process to produce chlorantraniliprole; we intend to defend vigorously the validity of both patents. During the third quarter of 2022, the China Patent Review Board issued rulings which held that the two challenged patents were not valid in China. We believe the Review Board's decisions are seriously flawed both on procedural and substantive ground and we have filed appeals. Under Chinese law, the patents remain valid but are not enforceable pending appeal. Given the unique and specific Chinese patent laws and legal procedures at issue in that situation, we do not believe that the China Patent Review Board's decisions would materially impact our enforcement of similar patents in other countries. Patent challenges in response to enforcement efforts is expected as an ordinary defense tactic in patent enforcement cases, and have been raised in several of our enforcement cases to date; we intend to defend vigorously any diamide patents that are challenged. ***While we believe that the invalidity or loss of any particular patent, trademark or license after appeal would be an unlikely possibility, our patent and trademark estate related to our diamide insect control products based on Rynaxypyr® and Cyazypyr® active ingredients in the aggregate are of material importance to our operations.***

110.     The 2022 10-K also included the same misleading risk disclosures regarding increased competition and the Company's ability to protect its intellectual property that were included in the 2021 10-K.

111.     On March 1, 2023, FMC attended the Bank of America Global Agriculture and Materials Conference.  During the conference, Douglas was questioned about "the patent expiry

outlook over the next couple of years" for the Diamide Products.  In response, Dougles stated the

following in relevant part:

> Listen, we've talked about the diamides a lot, obviously. We get a lot of questions about the patent estate. The patent estate is a matrix of just over 1,000 patents for the 2 molecules. The base composition of matter patents for Rynaxypyr started to come off last August. In some countries, we have runway in others. Same thing for Cyazypyr, which is the smaller molecule, the initial ones start to come off in August 2023 this year and again, spread out after that.
>
> ***There are also significant patents related to the whole process of manufacturing. These molecules are 15 or 16 synthetic steps, and we have many of those steps patented. I think it's worth noting today that the only legal material that's available is from FMC, even though the original patent has come off. Why is that? Because of the strength of the rest of the patent portfolio. . . .***
>
> So we already have a strong network out there of people who are selling diamides, so in some cases, competing with us in different markets, in many cases, expanding the market by having routes to market or formulations that we don't have. That was the intent of the plan. That's what we're seeing today. ***So we expect the diamide growth to continue.***
>
> Last year, diamides grew about 7%. I think in the mid-to long term, you're going to see them continue to grow in the mid-single digit. I think that's an important part of the algorithm of growth. They have been around for almost 20 years now. So that we talk about them as being new molecules, new technology, and they are, but they're coming off the end of their patent. ***And you should expect at some point towards the end of this decade, you will see generic manufacturing.*** That is what happens. So we're ready for that. We anticipated and we'll continue to invest in the diamides.

112.    Douglas then responded to a question regarding FMC's patent litigation in India,

stating in relevant part:

> ***There's a couple of cases in India that we recently won, a couple of cases in China as well. It's interesting when we bought the assets in 2018, there was already illegal material being sold in China, way back in 2018.*** That continues today. It's unfortunately a facet of the Chinese industry that many companies will not respect patents, and they go and make [il]legal materials. ***So it's not as if we're not used to competing with products out there that are of inferior quality but they are illegal, and we will enforce our patents all over the world.***

37

113. The statements identified above, made by or with the knowledge of the Individual Defendants, were materially false and misleading and served to conceal that: (i) due primarily to COVID-19 supply chain disruptions, many of FMC's distributors and retailers had accumulated significant amounts of excess inventory; (ii) this oversupply led to substantial reductions in global demand for FMC's products in 2022 and 2023; (iii) as a result, FMC's margins began to suffer as the Company attempted to encourage sales by offering discounts, and many of the products that were pre-purchased during the COVID-19 pandemic expired, leading to widespread product returns; (iv) demand for the Company's products, including its flagship Diamide Products, also suffered due to the introduction of low-cost generic alternatives into key markets across the world; and (v) FMC's revenue growth was further weakened by industry consolidation, as many consolidated distributors had financial incentives to promote competitors' products at retail.

e.    **The Truth Emerges**

114. The true state of FMC's business began to emerge on May 1, 2023. On that date, FMC issued a press release, filed with the SEC on Form 8-K, disclosing the Company's financial results for the first quarter of 2023. The release indicated that the Company was lowering its second quarter 2023 outlook due in part to reduced demand attributable to several factors, including "*channel inventory management in India*" and "*Diamides partners adjusting inventory levels*."

115. However, despite this revelation, in the same release, and in subsequent public disclosures, the Individual Defendants continued to obfuscate the truth, thus further artificially propping up the Company's stock price. For instance, the release included a statement from Douglas, in which he touted that "FMC delivered a solid first quarter with strong pricing actions, growth of new products and cost discipline driving margin expansion. *New product growth and*

38

*expanded market access contributed to robust North American sales,* which helped offset volume headwinds in other regions."

116.    Further, the release also stated the following with regard to FMC's full-year 2023 guidance:

> FMC is raising its full-year adjusted EBITDA guidance by $10 million at the midpoint. Full-year adjusted EBITDA is now expected to be in the range of $1.50 billion to $1.56 billion, representing 9 percent year-over-year growth at the midpoint based on the first quarter performance, continued pricing gains, positive product mix and projected input cost tailwinds.

117.    Finally, in the release, Douglas was quoted as stating, in relevant part that:

> We expect second quarter results to be largely in line with the prior year. We are raising our full-year EBITDA guidance, and narrowing our range, based on the first quarter performance and our expectation of continued pricing gains, positive mix supported by new products as well as input cost tailwinds that are projected to be realized in the second half of the year, particularly in the third quarter. *The strength of our portfolio, diversity of crop mix and investments in market access have positioned us well to deliver another year of revenue and earnings growth as well as margin expansion.*

118.    The next day, May 2, 2023, FMC hosted an earnings call with analysts and investors.  During the call Douglas stated that "[w]e are raising guidance for full year adjusted EBITDA by $10 million based on the first quarter outperformance, continued pricing gains, positive mix and projected cost tailwinds. *We now expect full year EBITDA to be in the range of $1.5 billion to $1.56 billion, representing 9% year-over-year growth at the midpoint*."

119.    During the call, Douglas was also questioned about FMC's "volume growth outlook" to which he replied in relevant part:

> The market is still operating at a very, very high level. *On the ground usage is very robust in most part of the world.* So the actual market itself is looking good in terms of soft commodity prices are remaining elevated, growers are looking to plant as much as they can. . . *overall, the volume perspective as we go through the year will improve for FMC*.

120.    Also during the call, UBS analyst Joshua David Spector asked the following question:

I guess when you think about Latin America and the volume shortfalls in the first half because of the drought conditions, I guess, what gives you confidence that inventory levels aren't at risk to the back half or next year? And kind of similarly on the diamides, where you talk about some partner channel destocking. What's the visibility that, that doesn't bleed into the second half as well?

121.    In response, Douglas claimed that inventory destocking was already accounted for in the Company's guidance, stating in relevant part:

I think on the channel inventories, we'll see how we go through the second quarter. The markets are moving. You know what, *if the market doesn't change much, yes, there will be some channel inventory hangover as we go into the next season. That occasionally happens.* As the weather patterns improve as we go through the second quarter, we should be eating away at some of that inventory. So we'll see where the market gets to. Our expectation, as we're forecasting is for a more normal season as we enter Q4 and Q1 into next year in Latin America. *On the diamides, what we're telling you in our guidance now is that the partners that are reducing inventories, that's not just an event now that continues through the rest of the year. So that's already built into our forward-looking guidance.*

122.    During the same call, Sandifer spoke to FMC's working capital and cash flow, stating in relevant part:

*I think the pattern of our working capital and our cash flow for the year is very similar to what you've seen in the last four years*, strongly negative in Q1, will be modestly positive in Q2, and then *you see significant positive cash flows in Q3 and Q4 . . . we expect a normal pattern as we go through the rest of the year.*

123.    Also on May 2, 2023, FMC filed its Quarterly Report with the SEC on Form 10-Q for the first quarter of 2023 (the "1Q23 10-Q"). The 1Q23 10-Q was signed by Sandifer and contained certifications signed by Douglas and Sandifer pursuant to SOX attesting to the accuracy and completeness of the 1Q23 10-Q. The 1Q23 10-Q included the misleading risk disclosures regarding increased competition and the Company's ability to protect its intellectual property that were included in the Company's previously filed annual reports.

40

124.   As a result of the above disclosures, FMC's stock price declined from $109.83 per share on May 1, 2023 to $103.32 per share on May 2, 2023, representing a decline of 5.93%.

125.   On May 9, 2023, FMC attended the Goldman Sachs Industrials & Materials Conference.  During the conference, Sandifer promoted the Company's purported growth despite adverse market conditions, stating in relevant part:

> Look, we reported last week earnings EBITDA that was about $7 million above the midpoint of our guidance range with earning—EPS is well above midpoint of guidance range. Revenue was a bit lighter than what we had guided. But ***overall, a strong quarter. And I think—we think about what's going on in our space, another demonstration of our ability to deliver earnings as guided and predicted despite market conditions.*** And that's been very much a hallmark of FMC, particularly over the last 5 years, and our current iteration is a focused agricultural sciences company. In the quarter itself, a bit of revenue softness, two key spots drought in South and Southern Brazil and Argentina was a driver certainly in the lower volumes in the quarter as was some lower volumes in the cereal herbicide markets in Europe. ***I'd say low growth in Asia was expected and a very, very strong growth in North America also expected. So I think generally, the quarter largely as expected***, big—the real surprise was a bit of softness in some of the core European markets, which I would attribute to both falling crop prices for cereals, a little bit of hesitancy in the channel there around the channel inventory levels and stocking. ***But in general, I'd say, overall, a solid quarter. So we have outperformed our guidance. We carried a little bit more than that through in a raise of guidance for the full year in part because we do feel confident in our ability to deliver at the midpoint of our guidance range, $1.53 billion in EBITDA for 2023 with about $6.15 billion in revenue. So what's changed? I think our guidance and our outlook for the year has always been predicated on growth, more balanced between price and volume than in previous years with pricing as a strong contributor mid-single-digit pricing for the year, a bit stronger than that in the first half, a little less than that in the second half, complemented by continued volume growth, basically independent of what market conditions are.*** We've seen a steady compounding, growing 5% to 7%, actually a little bit above 7% compounded for 5 years now, irrespective of what the growth of the market has been in each year because it's really been driven by technology penetration, by new products and to a lesser degree and more recent degree by some investments we've made in expanding our market access ***by putting more people on the ground, agronomists, marketing salespeople to help people understand how to help growers in particular, understand how best to utilize our products. And that's starting to really pull through some demand.***

126. During the conference, Sandifer also spoke about generic competitors for the Diamide Products, stating in relevant part:

Some of the earliest patents which are around the composition of matter, composition of matter of the fundamental active ingredient molecules started rolling off last year. Despite that, *there's not a single legal competitor in Rynaxypyr in the world today that said differently, that isn't buying it from us.* Now there are illegal competitors and have been since before we bought the business. *So there's been [illegal] material, particularly in China and India, always. But there are no current legal entrants in either of those markets where a the [sic] initial composition of matter patents have expired. And that's in part because that's just the beginning of the story around the patent protection.* We have patents on manufacturing processes. And the diamides are 15—and 16—step process is to produce a molecule we have patents on many of those individual steps. We have patents on the composition, a matter of many of the intermediates that are produced in those steps. Many of those intermediates have no other commercial use of this to be made and further refined into being Rynaxypyr or Cyazypyr. We have patents on formulations of products. So while we had a couple of patents roll off last year, we also had a number of new patents granted, including for some value—added formulations for Rynaxypyr, some of the new product growth we were talking about earlier. So the patent of the state is not a statistic asset. It is something that we're continuing to invest in, and we're continuing to renew. We have always presumed that over time, there would be generic entry into this marketplace. That's one of the reasons why we so aggressively pursued partnerships. . . . So I think we've managed very aggressively that patent estate, the branding, the partnerships, continued innovation around those molecules. And while certainly, yes, we expect—you're not going to grow doubling every 5 years forever, law of large numbers comes into play. *But we do see that the diamide family continuing to compound in that mid-single-digit range through the rest of the decade and continue to grow profit dollars, not just growing revenue.*

127. Also, during the conference, Sandifer was questioned about channel inventory in the Company's LATAM region. In response, Sandifer stated the following in relevant part:

I'd say there's a couple of hotspots around the world, but generally, we're pretty comfortable with channel inventory overall around the world, *places where we have a little—some backup of channel inventory, Southern Brazil and Argentina, where there was a drought, and it was a pretty—the consumption of crop chemicals was down a bit this year for the season that's wrapping up.* Certainly, there's a little bit of channel inventory there. . . . *But we see in demand for crop protection products being very, very healthy despite what may—where there might be a little bit of channel inventory of different spots.*

42

128.    On May 18, 2023, FMC attended the BMO Capital Markets Global Farm to Market

Conference.  During the conference, Douglas spoke to FMC's 2023 volumes, stating in relevant

part:

> ***When you think about volumes on the ground, so what is the grower using, volumes are very good.*** So we're seeing acreage increase overall in Brazil, good conditions expected in the U.S., especially in the Midwest, other parts of the world in good condition. . . . ***So the actual volume on the ground, what a grower is using, it might not be as high as 2022, but that was a record year. We're still at extremely high volumes. Where the volume discussion is, is what is happening in retail and distribution. So we feel good about the ultimate volume. It's managing through what is essentially the end of all the COVID supply chain issues that we've had that are bouncing through distribution and retail. So my message is really good volumes down on the field. We see that all over the world.*** There are pockets where it's not so good, and we can talk about that later. ***But overall, volumes are good.***

129.    Douglas was also questioned during the conference regarding market dynamics and

channel inventories across the Company's different regions.  In response, Douglas stated in

relevant part:

> Yes. ***Start off in North America. We feel very good about where the U.S. and Canadian markets are.*** We had a very good first quarter, which is getting ready for the season. Obviously, the planting season, things are going well. So I think the U.S., assuming the weather patterns hold, should have a very, very good season. Don't forget, soft commodity prices are still high. They're not at record highs, but they're well above average. Most of the 10-and 5-year stock-to-use rations for many of the soft commodities are below the averages. You have more weather impacts, as you just said around the world. So I think growers are feeling bullish about their ability to actually earn more money from what they're producing, which is always a good sign. ***So U.S., North America, all good. I would say, in Europe, Northern Europe, we're gearing up for the season once again. Northern Europe is in pretty good shape.*** Southern Europe is dry. You look at the press on what is happening in Spain, parts of Italy, a lot of rain. So guess what the trend is I'm talking about here, it's volatile weather patterns, much more than we ever used to see 10 years ago. ***But Europe, overall, pretty good. Southern Europe, a little dry. Asia, India, we've talked about a number of times. We have channel inventory in India, so do other people in the industry. A couple of bad years of monsoon, rice acreage reductions that is hopefully turning around this year. So we should work our way through that as we go through 2023.*** Australia, very dry, unexpectedly. We had 3 years of very good weather. Now we're in a drought situation in Australia, which impacted Q1 in Asia. ***Latin America, Brazil, the North Mexico, all good, the south of Brazil and Argentina, I think it's been well documented, extremely dry in Q4 and in Q1.***

*That has continued. Argentina being the worst impacted. So I would expect channel inventories in Argentina or in the south of Brazil as we go through this season will remain elevated.* So it's as usual, a mixture of what we see in the world. But what we do see is those more volatile weather patterns occurring all over the world now.

130.    With respect to patents for the Company's Diamide Products, Douglas stated the following in relevant part during the conference:

It's been a fantastic acquisition for us five years ago. When we bought that set of products, they were about $1 billion in size. Today, they are $2.1 billion. So we've more than doubled that business in five years. The chemistry is some of the most recent chemistry as an insecticide. It's very targeted. It has a great environmental profile. What we've done over the last five years is a couple of things. *First of all, there is a very strong patent estate around these products. The composition of matter patents for one of the main molecules came off last year. However, there are numerous process patents, et cetera, the follow on from that, that allow us patent protection in some countries through 2029. What we did was also apply for more registrations.* So for a generalist in this industry, it's one of the most regulated industries in the world, and you cannot sell a product without a registration. And that registration basically says you can sell this product at these rates, application rates on this crop in this geography, and you can't sell without that. What we've done is applied for more registrations for these products around the world on different crops in different geographies. *So we still have a long runway of registrations to come. Something like 60% to 70% of the registrations we have, there is an additional amount to come. So we know we have a runway of taking share in markets where the products are not currently registered. That's good for us.* It's good for the industry. The second piece is really the insecticide market is about a $16 billion market around the world. And there are some older chemistries that are losing their registrations around the world. Now when a product is removed from a registration, it means you can't sell it but the grower still needs products to sell—to buy to take the pests away. So we're taking share from a lot of the older chemistries. So I think sort of the mid-to longer-term growth rate for these types of products are in the mid-single-digit range. I do see the fact that those molecules are very large now. I mean *Rynaxypyr is one of the largest molecules in the world. You're reaching the law of big numbers. So mid-single digit for a $2.1 billion portfolio is a good growth rate. We believe that will continue as we— as I said, take the registrations, take market share from older chemistries.*

131.    Then, on July 10, 2023, the truth was further disclosed when FMC issued a press release announcing that the Company was reducing its second quarter and full-year 2023 guidance. The release included a statement from Douglas in which he admitted the following in relevant part:

44

*Towards the end of May, we experienced unforeseen and unprecedented volume declines in three out of four operating regions, as our channel partners rapidly reduced inventory levels. . . . Our full-year outlook for revenue and adjusted EBITDA has been revised to reflect these channel dynamics and their impact to volumes,* as well as the benefit from improved input costs and the significant operating costs mitigation actions we have already implemented.

132. On this news, the price of FMC's stock fell from $93.04 per share on Friday, July 7, 2023 to $82.67 per share on Monday, July 10, 2023. Representing a decline of approximately 11%.

133. On August 3, 2023, FMC hosted an earnings call with analysts and investors to discuss the Company's second quarter 2023 financial results. During the call Salvator Tiano of BofA Capital Markets asked the following questions in relevant part:

> You're talking about the destocking. So essentially, your view and your understanding is that diamide demand, whether it's branded products or from your partners, is holding up, but your partners like UPL are going above and beyond to lower their AI purchases firstly. And secondly, I think UPL specifically entered the U.S. market with its SHENZI product a few months ago. What is the impact for this to your own branded business in the U.S.?

134. In response, Dougles stated the following in relevant part:

> So first of all, when we talk about supply and technical-grade diamides to our partners, think of us as essentially a raw material supplier. So they're treating as a raw material supplier, the same as we're treating our raw material suppliers. So it's nothing more than that. It is a simple case of they obviously have demands on their inventories that they're having to reduce, and we are part of that. We do that to our own suppliers and are doing it right now. So you see that. *From a demand perspective, we don't think their demand is slowing down at all, neither [is] ours, as we just commented on.*

> \*       \*       \*

> To the second part of your question with regards to competition in the U.S., we've seen competition for some time in many parts of the world with the diamides. What we do know is that our branded products and the new introductions that we're making of new formulations are moving the needle. *In other words, we're not selling the same products that we were selling five years ago. We're selling more sophisticated, higher-concentration formulations to our current customers. So*

45

*where generics are coming in with a certain type of product, we're not selling those products anymore. We're selling something completely different.*

135.    During the same call, Douglas was questioned about generic competitors in the market.  In response, Douglas stated the following in relevant part:

Listen, generics play a major role in the marketplace. They have been around and they are around. *We don't necessarily play in a lot of those markets.* It's not to say that the markets they play in are not valuable, they are, *but we don't have a lot of generic pressure in a lot of our product lines, mainly because of how we differentiate though either new active ingredients or new formulations that we bring to market.* So I expect the generic market to get more competitive, but we don't play in that space.

136.    Douglas was also questioned about channel inventory destocking, specifically with respect to FMC's previous long-term issues with destocking and how things were different now. In response, Douglas stated in relevant part:

Yes. 2015, you've got to remember back to 2015, it seems a long time ago now, but that was a particular event in Brazil. It was both inventory, it's currency impact. And it was, again, that scarcity of products leading into that. *I think this is different in the sense of it's broader and it's happening much faster. In other words, the decreases we're seeing on a quarterly basis right now, they're much more extreme than they were before.* I think the other thing for us, in particular, although there was a lot of people impacted by the Brazilian event, there was a new seed trait that was introduced into Brazil for soybeans, which impacted insecticides within a reasonably short time frame. That was a factor that it's certainly not at play today in any way, shape or form. *So I don't necessarily look back on Brazil as a proxy for what is happening today.*

137.    Then, on September 7, 2023, Blue Orca Capital published a report revealing previously undisclosed legal defeats that FMC had suffered in China and India related to the enforceability of the Company's patents for its Diamide Products.  The report also detailed the influx of generic diamide products into the markets in India, China, and Brazil.

138.    Specifically, the report from Blue Orca revealed how FMC "concealed from investors the deterioration of [its] core business[], resulting in an inescapable cycle of falling revenues, plummeting cash flows, [and] declining profits."  The report also revealed that FMC

46

"concealed from investors that it [had] suffered a recent string of stunning legal defeats around the globe that [had] enabled competitors to now launch competing generics at prices up to 80% below the price of FMC's flagship insecticide product," the Diamide Products.  Further, the report stated in relevant part:

> Despite the expiration of the composition patents on FMC's diamides, DMC tells investors it will not face generic competition on its flagship products until 2026 at the earliest because FMC still holds a suite of 'process' patents, which FMC claims will bar generic entrants for the next several years. Absurdly, FMC even tells investors that 'there is not a single legal competitor . . .in the world today.' This is simply not true.

139.    FMC responded to the Blue Orca Report the same day, September 7, 2023.  In its response, FMC claimed that Blue Orca made "misleading and factually inaccurate statements regarding FMC's patents for its diamide insecticide technology and inaccurately speculated on the strength of FMC's business."

140.    On this news, FMC's stock price fell from $73.35 per share on September 6, 2023 to $67.91 per share on September 7, 2023.  Representing a decline of approximately 7.4%.

141.    On October 23, 2023, FMC issued a press release announcing that the Company was reducing its third quarter and full-year 2023 guidance.  According to the release, this reduction in guidance was largely attributable to "substantially lower sales volumes in Latin America, particularly destocking in Brazil and to a lesser degree drought in Argentina."  The release also included a quote from Douglas in which he stated in relevant part:

> *During the third quarter, we observed continued channel destocking in all regions: however, the magnitude of the destocking in Brazil was much greater than we had anticipated. . . .* While application of products by growers remains stable, significant global restocking impacts are expected to persist into next year and we have adjusted our full year outlook accordingly. *With destocking conditions not expected to improve in the near-term, we have initiated an immediate restructuring process for our operations in Brazil and have launched a broader, more comprehensive process to review and adjust our total company cost structure.*

47

142. Additionally, FMC disclosed a reduction of the Company's third quarter, fourth quarter, and full-year 2023 revenue and Adjusted EBITDA guidance, including a decrease in full-year 2023 revenue guidance of 9.2% to 17.0% and a decrease in the full-year Adjusted EBITDA guidance of 20.8% to 30.7%.

143. On this news, FMC's stock price dropped from $60.28 per share on October 20, 2023 to $50.52 per share on October 24, 2023. Representing a decline of approximately 16.2%.

144. The truth fully emerged on October 30, 2023. On that date FMC issued a press release disclosing the Company's financial results for the third quarter of 2023. The release stated that "***[t]he company is lowering its full-year free cash flow guidance to a range of negative $860 million to negative $640 million due to the reduction in expected second half EBITDA and the impacts to working capital from higher inventory and lower payables.***"

145. The release also included a statement from Douglas in which he stated that "the global crop protection market remains challenged with ***severe destocking across the channel impacting volume growth this year.*** In this environment, ***we are implementing a company-wide restructuring program to right-size our cost base.***"

146. Further, FMC published slides in its website that disclosed that third quarter revenues were down across all of the Company's regions due to "[l]ower volumes in all regions caused by destocking from channel customers and partners."

147. The next day, during an earnings call hosted by FMC to discuss its third quarter 2023 earnings, Sandifer admitted in relevant part:

> ***As of September 30, gross debt-to-EBITDA was 3.6x, while net debt-to-EBITDA was 3.3x, reflecting the sudden deceleration of our earnings beginning in Q2 and elevated debt levels due to higher workings capital resulting from this deceleration.*** The covenants to our revolving credit facility evaluate our leverage using a metric that includes adjustments to both EBITDA and debt as reported.

48

With these adjustments, covenant leverage was 3.8x as of September 30 relative to a maximum allowable of 4.0x. We do not view this as an acceptable leverage level relevant to our covenant.

In light of this and the reduced outlook for Q4, *we are currently in advanced discussions with our bank group to further amend our covenants to provide additional headroom for the company as we adjust our cost structure and debt levels to current market realities*.

148.    During the call, Sandifer stated the following regarding the Company's cash flow generation and outlook:

FMC generated free cash flow of $32 million in Q3 down from $360 million in the prior year period. *Cash from operations declined $316 million, with lower EBITDA and substantially lower payables as we adjust our operations to match current demand.*

\*    \*    \*

Year-to-date cash flow through September 30 was negative $790 million, $651 million lower than the prior year period. *Nearly all of the reduction stems from lower cash from operations, which was down substantially due to lower EBITDA and lower payables.*

\*    \*    \*

We've reduced our free cash flow guidance for 2023 to negative $750 million at the midpoint, down from breakeven in our previous guidance. *The reduction in full year cash flow outlook is a direct result of lower-than-expected second half EBITDA and the impact of reduced volumes on working capital.*

149.    On this news, FMC's stock price fell from $52.18 per share on October 30, 2023, to $47.90 per share on October 31, 2023.  Representing a decline of approximately 8.2%.

150.    After the end of the Relevant Period, further details emerged about the issues plaguing the Company.  On November 7, 2023, FMC entered into an amendment to the Fifth Credit Agreement, which provided for a leverage ratio as high as 6.50:1.00 for the fourth quarter of 2023 and the first two quarters of 2024.  In a press release issued the same day, Sandifer stated

that the amendment provided "ample headroom and duration that is well beyond what we believe will be required as we navigate the current challenges to free cash flow."

151. Then, on November 16, 2023, during FMC's annual Investor Day Conference, Douglas stated that "*[a] combination of inflationary prices and concerns about supply security during 2021 and '22 resulted in channel participants and growers over-stocking in the last couple of growing seasons.*"

152. Finally, on June 11, 2024, Douglas abruptly resigned as FMC's President and CEO.

### f. Insider Sales

153. During the Relevant Period, Brondeau, Douglas, Sandifer, Johnson, and Volpe each sold their personally held FMC stock at artificially inflated prices while in possession of MNPI.

154. While the price of FMC stock was artificially inflated due to the wrongful conduct described herein, Brondeau made the following suspiciously timed stock sales:

- On February 22, 2022, Brondeau sold 5,884 shares of his personally held FMC stock at an average price of $116.89 per share, recognizing $687,781 in proceeds.

- On February 24, 2022, Brondeau sold 23,935 shares of his personally held FMC stock at an average price of $114.69 per share, recognizing $2,745,105 in proceeds.

- On February 23, 2023, Brondeau sold 5,361 shares of his personally held FMC stock at an average price of $128.73 per share, recognizing $690,121 in proceeds.

- On February 27, 2023, Brondeau sold 2,318 shares of his personally held FMC stock at an average price of $128.87 per share, recognizing $298,721 in proceeds.

155. While the price of FMC stock was artificially inflated due to the wrongful conduct described herein, Johnson made the following suspiciously timed stock sales:

50

- On January 3, 2023, Johnson sold 37 shares of his personally held FMC stock at an average price of $124.80 per share, recognizing $4,617 in proceeds.

156. While the price of FMC stock was artificially inflated due to the wrongful conduct described herein, Douglas made the following suspiciously timed stock sales:

- On February 22, 2022, Douglas sold 2,041 shares of his personally held FMC stock at an average price of $116.89 per share, recognizing $238,572 in proceeds.

- On February 24, 2022, Douglas sold 5,216 shares of his personally held FMC stock at an average price of $114.69 per share, recognizing $598,223 in proceeds.

- On February 23, 2023, Douglas sold 4,477 shares of his personally held FMC stock at an average price of $128.73 per share, recognizing $1,091,244 in proceeds.

- On February 27, 2023, Douglas sold 3,359 shares of his personally held FMC stock at an average price of $128.87 per share, recognizing $432,874 in proceeds.

157. While the price of FMC stock was artificially inflated due to the wrongful conduct described herein, Volpe made the following suspiciously timed stock sales:

- On February 27, 2023, Volpe sold 1,694 shares of his personally held FMC stock at an average price of $119.82 per share, recognizing $202,975 in proceeds.

158. While the price of FMC stock was artificially inflated due to the wrongful conduct described herein, Sandifer made the following suspiciously timed stock sales:

- On February 22, 2022, Sandifer sold 1,312 shares of his personally held FMC stock at an average price of $116.89 per share, recognizing $153,360 in proceeds.

- On February 24, 2022, Sandifer sold 2,806 shares of his personally held FMC stock at an average price of $114.69 per share, recognizing $321,820 in proceeds.

- On March 4, 2022, Sandifer sold 4,997 shares of his personally held FMC stock at an average price of $119.36 per share, recognizing $596,442 in proceeds.

- On February 23, 2023, Sandifer sold 1,428 shares of his personally held FMC stock at an average price of $128.73 per share, recognizing $190,778 in proceeds.

- On February 27, 2023, Sandifer sold 983 shares of his personally held FMC stock at an average price of $128.87 per share, recognizing $126,679 in proceeds.

- On March 2, 2023, Sandifer sold 5,000 shares of his personally held FMC stock at an average price of $127.77 per share, recognizing $638,850 in proceeds.

159.   Collectively, Brondeau, Douglas, Sandifer, Johnson, and Volpe recognized millions of dollars in profits as a result of their sales of FMC stock while in possession of MNPI.

**g.   Stock Repurchases During the Relevant Period**

160.   Between 2022 and the start of 2023, the Individual Defendants caused FMC to spend at approximately $175 million of Company assets to repurchase approximately 1.5 million shares of the Company's own common stock at prices that were artificially inflated.

161.   Specifically, according to the Company's public filings, FMC purchased 875,480 shares for $99,999,895 during the fourth quarter of 2022, 193,815 shares for $24,999,976 during the first quarter of 2023, and 457,237 shares for $49,999,988 during the second quarter of 2023, for a total of 1,526,532 shares for $174,999,859.

162.   However, at the time of the repurchase, FMC's stock was actually only worth $47.90 per share.  As such, FMC overpaid by approximately $103.15 million for repurchases of its own stock during the relevant period.

## VI.     THE SECURITIES CLASS ACTION

163.     As a direct result of the Individual Defendants' actions and inactions, FMC has become the subject of the damaging and costly Securities Class Action, which is itself the product of the consolidation of two separately filed Securities Class Actions.[2]  On July 17, 2024, an Amended Complaint was filed in the Securities Class Action.  The Amended Complaint names as defendants FMC, Douglas, and Sandifer and makes claims under 10(b) and 20(a) of the Securities Exchange Act of 1934 and alleges facts substantially similar to those raised herein.

164.     On September 17, 2024, Defendants in the Securities Class Action filed a Motion to Dismiss the Securities Class Action and on November 4, 2024, Plaintiffs filed their response. The Court in the Securities Class Action has yet to rule on the Motion to Dismiss.  As such, there is the very real possibility that the Securities Class Action could continue to be a significant drain on FMC's financial resources, a distraction to its efficient and effective operation of its business, and a threat to its reputation in the business and investment communities, potentially for years to come.

## VII.    DAMAGES TO THE COMPANY

165.     As a result of the misconduct described herein, the Company has suffered, and will continue to suffer, immense economic and reputational harm, including, but not limited to, lost revenue, legal liability, compromised financial integrity, susceptibility to government investigation and action, and irreparable damage to its credibility in the business community and financial marketplace.

---

[2] The two Securities Class Actions are: *Heeg v. FMC Corporation, et al.* Case No. 23-4398 and *Oklahoma Firefighters Pension and Retirement System v. FMC Corporation, et al*. Case No. 23-4842. Both actions were filed in the United States District Court for the Eastern District of Pennsylvania.

166. To date, as a result of the Individual Defendants' misconduct, FMC has been and will continue to be forced to expend millions of dollars. Such losses include, but are not limited to:

a) Legal and other costs incurred in connection with being named as a defendant in the Securities Class Action, including the defense and settlement of, or judgement in, the litigation;

b) Costs incurred with respect to implementing remediation efforts with respect to the Company's internal controls over financial reporting; and

c) Costs incurred in connection with the lavish and unjustified compensation and benefits paid to Individual Defendants while they were actively breaching their fiduciary duties to the Company.

167. Moreover, these actions have irreparably damaged FMC's corporate image and goodwill. For at least the foreseeable future, FMC will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that FMC's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VIII. DERIVATIVE AND DEMAND REFUSAL ALLEGATIONS

168. Plaintiff brings this action derivatively in the right and for the benefit of FMC to redress injuries suffered, and to be suffered, by FMC as a direct result of the wrongdoing alleged herein. FMC is named as a nominal defendant solely in a derivative capacity.

169. Plaintiff will adequately and fairly represent the interests of FMC in enforcing and prosecuting its rights.

170. Plaintiff has continuously been a stockholder of FMC at times relevant to the wrongdoing complained of and is a current FMC stockholder.

171. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

172.   Plaintiff did not make a demand on the Board to institute this action as such a demand would be a futile, wasteful, and useless act, as set forth below.

173.   When this action was filed, FMC's Board consisted of the following nine (9) members: Individual Defendants Brondeau, Cordeiro, Davidson, Fortmann, Johnson, and Verduin (the "Director Defendants Presently on the Board") and non-party directors Michael Barry, Steven T. Merkt, and John M. Raines.  Plaintiff need only allege demand futility as to five of the nine Directors who are on the Board at the time this action commenced.  Plaintiff can adequately allege demand futility as to six of the nine directors.

174.   A pre-suit demand on the Board would be futile—and thus Plaintiff has made no such demand—as there is legitimate reason to believe that a majority of the members of the FMC's Board lack the capability to make independent and/or disinterested decisions with regard to initiating and pursuing a proper legal action.

175.   Throughout the Relevant Period, the Director Defendants Presently on the Board have either known or, pursuant to their oversight responsibilities, should have known that the Company did not possess effective internal controls over financial reporting.  Further, because they were aware, or should have been aware that the Company's internal controls over financial reporting were not effective, they knew or should have known that public statements made concerning the Company's reported business and financial performance were materially false and misleading.  Also, at no time did the Director Defendants Presently on the Board take any good faith action to prevent or remedy the issues befalling the Company.  In fact, each of the Director Defendants Presently on the Board either approved and/or permitted the wrongdoing alleged herein to occur, or at the very least, were unreasonable in ignoring the wrongdoing.  Demanding that these directors pursue legal action under such circumstances would, in effect, be demanding

that a majority of the directors bring legal action against themselves and their own interests. As such, the Director Defendants Presently on the Board, comprising the majority of FMC's Board, are not disinterested parties and thus demand is excused as to them.

176. Further, Brondeau is not disinterested or independent. As Chairman of the Board during the Relevant Period, Brondeau had a unique duty to ensure that the Board was effectively overseeing the Company and that any material risks to the Company's operations and wellbeing were effectively detected and remedied. By permitting the Company to continue operating with ineffective internal controls over financial reporting that ultimately led to the dissemination of false and misleading public statements, Brondeau failed in his fundamental duty as Chairman of the Board and likely faces substantial liability for the wrongdoing described herein. In addition, Brondeau is presently employed as FMC's CEO and also held the role of CEO from January 2010 until May 2020. As such, Brondeau is beholden to the Company for his employment position and the corresponding lucrative salary. Further, while Brondeau's prior iteration as FMC's CEO occurred before the Relevant Period, the role was close enough in time that he likely was involved in the development and oversight of the very financial controls that ultimately failed during the Relevant Period. For these reasons, Brondeau faces a substantial likelihood of liability, is not disinterested or independent, and thus demand is excused as to him.

177. Cordeiro and Davidson are not disinterested or independent. As Chair and/or members of the Audit Committee, Cordeiro and Davidson were required to, among other things, monitor the integrity of the Company's financial statements and compliance by the Company with legal and regulatory requirements. The fact that the Company was permitted to operate with ineffective internal controls over financial reporting that led to materially false financial statements is indication that Cordeiro and Davidson were not effectively performing their duties as Chair

56

and/or members of the Audit Committee. Further, as members of the Board since 2011 and 2020 respectively, Cordeiro and Davidson would have been privy to the Company's inability to maintain effective internal controls and thus should have been aware that the Company's financial reporting was a material risk. Because they failed to make any substantive effort to correct the internal control errors impacting the Company and knowingly permitted the dissemination of materially false information to the public, Cordeiro and Davidson breached their duties as members of FMC's Board. For these reasons, Cordeiro and Davidson face a substantial likelihood of liability, are not disinterested or independent, and thus demand is excused as to them.

178. Fortmann, is not disinterested or independent. As a member of the Board since 2022, Fortmann had a duty to ensure that the Company was being operated in an effective manner. By permitting the Company to maintain ineffective internal controls over financial reporting and permitting the Company to disseminate materially false financial statements and materially false and misleading public statements concerning the Company's financial performance, Fortmann breached her duty as a member of FMC's Board. For these reasons, Fortmann faces a substantial likelihood of liability, is not disinterested or independent, and thus demand is excused as to her.

179. Johnson is not disinterested or independent. As a member of the Board since 2013, Johnson had a duty to ensure that the Company was being operated in an effective manner. By permitting the Company to maintain ineffective internal controls over financial reporting and permitting the Company to disseminate materially false financial statements and materially false and misleading public statements concerning the Company's financial performance, Johnson breached her duty as a member of FMC's Board. For these reasons, Johnson faces a substantial likelihood of liability, is not disinterested or independent, and thus demand is excused as to her.

180. Verduin is not disinterested or independent. As a member of the Board since July 2023, Verduin had a duty to ensure that the Company was being operated in an effective manner. By permitting the Company to maintain ineffective internal controls over financial reporting and permitting the Company to disseminate materially false financial statements and materially false and misleading public statements concerning the Company's financial performance, Verduin breached her duty as a member of FMC's Board. For these reasons, Verduin faces a substantial likelihood of liability, is not disinterested or independent, and thus demand is excused as to her.

181. Additionally, the problems impacting the Company's internal controls over financial reporting were fundamental issues impacting one of the Company's primary operational aspects. It is highly unlikely that the Director Defendants presently on the Board could not have been aware these issues were occurring. Yet despite the obvious and ongoing issues that were wreaking havoc on the Company's financial performance, the Director Defendants presently on the Board failed to take any meaningful action to stop or correct the issues and the multiple false and misleading statements and omissions being disseminated to the investing public. As such, all of the Director Defendants presently on the Board are liable for the harm described herein, are not independent or disinterested and as such demand is excused as to them.

182. Finally, each of the Director Defendants presently on the Board have also received and receive lucrative payments, benefits, stock options, and other compensation in their capacities as members of the FMC's Board and their control of the Company. Any litigation initiated against the Director Defendants presently on the Board would put this compensation at risk, thus making these Director Defendants neither disinterested nor independent.

## COUNT I

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

183.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

184.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding FMC.  Not only is FMC now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon FMC by the Individual Defendants.  With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase its own shares at artificially inflated prices, damaging FMC.

185.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

186.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about FMC not misleading.

187.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and

did control the conduct complained of herein and the content of the public statements disseminated by FMC.

188.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

189.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director made and/or signed the Company's 10-Ks filed with the SEC during the Relevant Period.

190.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

191.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934**

192.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

193.   The Individual Defendants, by virtue of their positions with FMC and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of FMC and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act.  The Individual Defendants had the power and influence and exercised the same to cause FMC to engage in the illegal conduct and practices complained of herein.

194.   Plaintiff, on behalf of FMC, has no adequate remedy at law.

## COUNT III

### Against the Officer Defendants for Breach of Fiduciary Duty

195.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

196.   The Officer Defendants owed and owe fiduciary duties to FMC and its stockholders.  By reason of their positions as fiduciaries to the Company, the Officer Defendants owed duties of good faith, loyalty, candor, and truthful disclosure.  In addition, the Officer Defendants have specific duties as defined by the Company's corporate governance documents, including its Code of Conduct that, had they been discharged in accordance with the Officer Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

197.   The Officer Defendants violated these duties by failing to properly oversee the Company's operations and by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentation described herein.  Furthermore, given the fundamental nature of global sales performance and intellectual property protections to FMC's operations, the Officer Defendants either knew, or should have known, that the public statements concerning the status and performance of these aspects of the business were materially false and misleading.

61

198. As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, FMC has sustained significant damages. Accordingly, the Officer Defendants are liable to the Company.

199. Plaintiff, on behalf of FMC, has no adequate remedy at law.

## COUNT IV

### Against the Director Defendants for Breach of Fiduciary Duty

200. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

201. The Director Defendants owed and owe fiduciary duties to FMC and its stockholders. By reason of their fiduciary relationships, the Director Defendants specifically owed and owe FMC the highest obligation of good faith, fair dealing, loyalty, and due care in the administration of the affairs of the Company, including, without limitation, the oversight of the Company's compliance with applicable laws, regulations, and ethical business practices, as well as the duty of candor and truthful disclosure with respect to their public statements.

202. In addition, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Code of Conduct and the charters of the various Board committees, and principles that, had they been discharged in accordance with the Director Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

203. The Director Defendants violated these duties by failing to properly oversee the Company's operations and by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein. Furthermore, given fundamental the nature of global sales performance and intellectual property protections to FMC's operations, the Director

Defendants either knew, or should have known, that the public statements concerning the status and performance of these aspects of the business were materially false and misleading.

204.    As a direct and proximate result of the Director Defendants' breach of their fiduciary obligations, FMC has sustained significant damages.    Accordingly, the Director Defendants are liable to the Company.

205.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## COUNT V

### Against Douglas and Sandifer for Contribution Under Sections 10(b) and 21D of the Exchange Act

206.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

207.    Douglas and Sandifer are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.    If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Douglas and Sandifer's willful and/or reckless violations of their obligations as officers of FMC.

208.    Douglas and Sandifer, because of their positions of control and authority as officers of FMC, were able to and did, directly, and/or indirectly, exercise control over the business and corporate affairs of FMC, including the wrongful acts complained of herein and in the Securities Class Action.

209.    Accordingly, Douglas and Sandifer are liable under §21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

210. As such, FMC is entitled to receive all appropriate contribution or indemnification from Douglas and Sandifer.

211. Plaintiff, on behalf of FMC, has no adequate remedy at law.

## COUNT VI

### Against Brondeau, Douglas, Sandifer, Johnson, and Volpe for Breach of Fiduciary Duty (*Brophy*)

212. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

213. During the Relevant Period, Brondeau, Douglas, Sandifer, Johnson, and Volpe sold their personally held FMC stock while in possession of MNPI regarding the issues raised herein. When Brondeau, Douglas, Sandifer, Johnson, and Volpe made the stock sales described herein, they were motivated to do so, in whole or in part, by the substance of the MNPI they possessed.

214. When Brondeau, Douglas, Sandifer, Johnson, and Volpe sold their stock, they knew that the investing public was unaware of the negative MNPI that they possessed. They also knew that if the information was disclosed, the market price of FMC would be significantly lower. Brondeau, Douglas, Sandifer, Johnson, and Volpe timed their stock sales to take advantage of the public's ignorance of the concealed facts and obtain a higher price for the stock they sold. They thereby benefited by misappropriating FMC's MNPI.

215. Plaintiff, on behalf of FMC, has no adequate remedy at law.

## COUNT VII

### Against the Individual Defendants for Waste of Corporate Assets

216. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

217.    The wrongful conduct alleged herein was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and on-going harm to the Company.

218.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) paying excessive compensation to certain of its directors and officers; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending FMC and certain of its officers against the Securities Class Action.

219.    Plaintiff, as a stockholder and representative of FMC, seeks restitution from the Individual Defendants, and each of them, for their wrongful conduct and fiduciary breaches.

220.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## COUNT VIII

### Against the Individual Defendants for Unjust Enrichment

221.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

222.    By their wrongful acts and omissions, and violations of law, the Individual Defendants were unjustly enriched at the expense of and to the detriment of FMC.

223.    The Individual Defendants either benefited financially from the improper conduct and their making lucrative insider sales, or received bonuses, stock options, or similar compensation from FMC that was tied to the performance or artificially inflated valuation of FMC, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

224.    Plaintiff, as shareholder and representative of FMC, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits,

including from, salaries, benefits, and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and breaches of fiduciary duty.

225.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of FMC, demands judgment as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of FMC and that Plaintiff is an adequate representative of the Company;

B.    Declaring that Individual Defendants breached and/or aided and abetted the breach of their fiduciary duties to FMC, wasted corporate assets, were unjustly enriched, and violated federal securities laws;

C.    Determining and awarding to FMC the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.    Directing FMC to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect FMC and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    The Board should require Individual Defendants to account to the Company for all damages sustained, or to be sustained, by the Company by reason of the wrongs and misconduct complained of herein, and should make certain that no Company funds are used towards any settlement or resolution of any litigation related to the wrongful conduct described herein;

66

2.      The Board should terminate, for cause, any Company employee responsible for the wrongdoing discussed herein;

3.      The Board should require Individual Defendants to return to the Company all salaries, bonuses, and the value of other remuneration of whatever kind paid to them during the time they were in breach of their fiduciary duties;

4.      The Board should require Individual Defendants to pay interest, at the highest rate allowable by law, on the amount of damages sustained by the Company as a result of their culpable conduct;

5.      The Board should adopt and implement internal controls and systems at the Company, as well as corporate governance reforms, to ensure that the improper and illegal conduct complained of herein is not permitted to occur in the future;

6.      The Board should strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding any unlawful activities, public disclosures, and internal controls.

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' ill-gotten gains or their other assets so as to assure that Plaintiff on behalf of FMC has an effective remedy;

F.      Awarding to FMC restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

G.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 6, 2026

**THE ROSEN LAW FIRM, P.A**.

*/s/ Olivia D. Simkins*

Olivia D. Simkins
101 Greenwood Avenue, Suite 520
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: osimkins@rosenlegal.com

**JOHNSON FISTEL, PLLP**
Michael I. Fistel, Jr.
Mary Ellen Conner
Murray House
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (619) 363-8326
Email: michaelf@johnsonfistel.com
        maryellenc@johnsonfistel.com

*Counsel for Plaintiff*

68

**VERIFICATION**

I, Johanna Dwyer, am a plaintiff in the within action. I have reviewed the allegations made in this Verified Stockholder Derivative Complaint, know the content thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing statements are true and correct. Executed this 14___ day of July, 2026.

DocuSigned by:

*Johanna Dwyer*

710BB71CFAAA44E...

JOHANNA DWYER